# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MASSACHUSETTS LOBSTERMEN'S
ASSOCIATION,

    *Plaintiff*,

v.

NATIONAL MARINE FISHERIES SERVICE,
*et al.*,

    *Defendants*.

No. 1:24-cv-10332-WGY

# DEFENDANTS' OPPOSITION TO PLAINTIFF'S
# MOTION FOR TEMPORARY RESTRAINING ORDER,
# <u>PRELIMINARY INJUNCTION, AND STAY</u>

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION .................................................................................................................. 1

LEGAL FRAMEWORK ....................................................................................................... 3

    I.    Marine Mammal Protection Act ................................................................................ 3

    II.    Consolidated Appropriations Act, 2023 .................................................................... 4

FACTUAL BACKGROUND ................................................................................................. 5

    I.    North Atlantic Right Whale ....................................................................................... 5

    II.    The 2021 Atlantic Large Whale Take Reduction Plan Amendment Rule ..................... 5

    III.    Litigation Challenging the 2021 TRP Amendment Rule and Biological Opinion ........... 6

    IV.    NMFS' 2022 and 2023 Wedge Closures .................................................................... 6

    V.    Plaintiff's Unsuccessful Motion for a Temporary Restraining Order Concerning the 2023

        Emergency Rule. ...................................................................................................... 7

STANDARD OF REVIEW .................................................................................................... 8

ARGUMENT ........................................................................................................................ 9

    I.    Plaintiff Has Not Shown It Is Likely to Suffer Irreparable Harm. ............................... 9

    II.    Plaintiff Is Not Likely to Succeed on the Merits. ...................................................... 13

    III.    The Balance of Harms and Public Interest Do Not Support Plaintiff's Request for

        Emergency Relief. .................................................................................................... 17

        A.    The balance of harms weighs against an injunction. ................................................ 17

        B.    Allowing the Final Wedge Rule to go into effect is in the public interest. ................ 20

CONCLUSION ................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Case**                                                                      **Page(s)**

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987) ........................................................................... 17

*Charlesbank Equity Fund II v. Blinds To Go*,
   370 F.3d 151 (1st Cir. 2004) ............................................................ 9, 12

*Dist. 4 Lodge of Int'l Ass'n of Machinists & Aerospace Workers v. Raimondo*,
   18 F.4th 38 (1st Cir. 2021) ........................................................ 12, 18, 19

*Dist. 4 Lodge of Int'l Ass'n of Machinists & Aerospace Workers v. Raimondo*,
   40 F.4th 36 (1st Cir. 2022) ................................................................. 19

*Doe 1-6 v. Mills*,
   16 F.4th 20, 37 (1st Cir. 2021) ........................................................... 10

*Esso Standard Oil Co. v. Monroig-Zayas*,
   445 F.3d 13 (1st Cir. 2006) ................................................................. 9

*Gonzalez-Droz v. Gonzalez-Colon*,
   573 F.3d 75 (1st Cir. 2009) ................................................................. 9

*Hyde Park Partners v. Connolly*,
   676 F. Supp. 391 (D. Mass. 1987) ....................................................... 10

*Long Term Care Pharm. All. v. Ferguson*,
   260 F. Supp. 2d 282 (D. Mass. 2003) .................................................. 10

*MLA v. NMFS,*,
   70 F.4th 582 (D.C. Cir. 2023) ........................................................... 6, 16

*Monahan v. Winn*,
   276 F. Supp. 2d 196 (D. Mass. 2003) .................................................. 10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................. 13

*NewellCompany v. Connolly*,
   624 F. Supp. 126, 127-28 (D. Mass. 1985) ........................................... 10

*Nken v. Holder*,
   556 U.S. 418 (2009) ....................................................................... 8, 9, 17

*Respect Me. PAC v. McKee*,
   622 F.3d 13 (1st Cir. 2010) ........................................................................... 8

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
   102 F.3d 12 (1st Cir. 1996) ........................................................................... 9

*Schweiker v. Hansen*,
   450 U.S. 785 (1981) ..................................................................................... 14

*Starbound, LLC v.Gutierrez*,
   2008 WL 1752219 (W.D. Wash. Apr. 15, 2008) ....................................... 14

*Strahan v. Coxe*,
   127 F.3d 155 (1st Cir. 1997) ....................................................................... 18

*Together Emps. v. Mass Gen. Brigham Inc.*,
   32 F.4th 82 (1st Cir. 2022) ..................................................................... 9, 12

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ....................................................................................... 15

*United States v. D'Annolfo*,
   474 F. Supp. 220 (D. Mass. 1979) .............................................................. 10

*United States v. Mass. Water Res. Auth.*,
   256 F.3d 36 (1st Cir. 2001) ......................................................................... 11

*Vaqueria Tres Monjitas, Inc., v. Irizarry*,
   587 F.3d 464 (1st Cir. 2009) ......................................................................... 9

*Voice of the Arab World v. MDTV Med. News Now*,
   645 F.3d 26 (1st Cir. 2011) ........................................................................... 8

*Water Keeper All. v. U.S. Dep't of Def.*,
   271 F.3d 21 (1st Cir. 2001) ......................................................................... 11

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ............................................................................... 11, 17

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ................................................................................. passim

*Young v. Wells Fargo Bank*,
   717 F.3d 224 (1st Cir. 2013) ....................................................................... 17

**Statutes**

5 U.S.C. §§ 701-706 ........................................................................................................ 13

5 U.S.C. § 706(2)(A) ....................................................................................................... 13

16 U.S.C. § 1361(1) ......................................................................................................... 15

16 U.S.C. § 1361(2) ..................................................................................................... 3, 15

16 U.S.C. § 1362(19) ......................................................................................................... 5

16 U.S.C. § 1362(20) ....................................................................................................... 18

16 U.S.C. § 1371(a) ......................................................................................................... 15

16 U.S.C. § 1372(a) ......................................................................................................... 15

16 U.S.C. § 1374(d)(6) .................................................................................................... 13

16 U.S.C. § 1387(a) ........................................................................................................... 3

16 U.S.C. § 1387(f) ............................................................................................................ 5

16 U.S.C. § 1387(f)(1) ....................................................................................................... 4

16 U.S.C. § 1387(f)(2) ..................................................................................................... 15

16 U.S.C. § 1387(f)(6)(A)(i) .............................................................................................. 5

16 U.S.C. § 1387(f)(6)(C) .................................................................................................. 4

16 U.S.C. § 1387(f)(7)(A) .................................................................................................. 4

16 U.S.C. § 1387(g)(1) ....................................................................................................... 4

16 U.S.C. § 1387(g)(4) ................................................................................................. 4, 13

16 U.S.C. § 1801 ............................................................................................................. 14

Pub. L. No. 117-328, Div. JJ, Tit. I, 136 Stat. 4459, 6089-90 ........................................ 4

**Regulations**

35 Fed. Reg. 18,319 (Dec. 2, 1970) .................................................................................. 5

62 Fed. Reg. 39,157 (July 22, 1997) ................................................................................. 5

86 Fed. Reg. 51,970 (Sept. 17, 2021) ............................................................................. 5

87 Fed. Reg. 55,405 (Sept. 9, 2022) ............................................................................ 13

89 Fed. Reg. 8,333 (Feb. 7, 2024) ............................................................................ 5, 7

## LIST OF ACRONYMS

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **CAA** | Consolidated Appropriations Act, 2023 |
| **CCS** | Center for Coastal Studies |
| **DST** | Decision Support Tool |
| **DMF** | Massachusetts Division of Marine Fisheries |
| **ESA** | Endangered Species Act |
| **LMA1** | Lobster Management Area 1 |
| **MALA** | Massachusetts Lobstermen's Association |
| **MLA** | Maine Lobstermen's Association |
| **M/SI** | Mortality or serious injury |
| **MSA** | Magnuson-Stevens Fishery Conservation and Management Act |
| **MMPA** | Marine Mammal Protection Act |
| **MRA** | Massachusetts Restricted Area |
| **NMFS** | National Marine Fisheries Service |
| **TRO** | Temporary Restraining Order |
| **TRP** | Atlantic Large Whale Take Reduction Plan |
| **TRT** | Atlantic Large Whale Take Reduction Team |

**INTRODUCTION**

The North Atlantic right whale ("right whale") is one of the most endangered species on the planet. Declining since 2010, the most recent data indicate a population of approximately 356 individuals in 2022. A leading cause of mortality is entanglement in vertical buoy-line fishing gear. In 2021, the National Marine Fisheries Service ("NMFS") implemented a suite of measures through an Atlantic Large Whale Take Reduction Plan amendment rule ("TRP Amendment Rule") under the Marine Mammal Protect Action ("MMPA") to mitigate right whale entanglement risk, including seasonal Federal water closures of lobster fishing. However, an unanticipated state seasonal closure issued by the Massachusetts Division of Marine Fisheries ("DMF") in 2021 inadvertently caused a seasonal gap in regulatory protections in a wedge-shaped area ("MRA Wedge") of open waters between adjacent closures. Waiting for the closures to end, lobstermen congregated with their gear in the MRA Wedge while right whales migrated through the area, leading to a seasonal hotspot of entanglement risk. DMF alerted NMFS to this problem after reviewing right whale and gear sightings for 2021.

In response, NMFS implemented an emergency whale protection strategy for the MRA Wedge. First, NMFS issued a seasonal emergency closure of the MRA Wedge in 2022 ("2022 Emergency Rule") under the MMPA. Recognizing that the hotspot would recur annually, NMFS started the process towards a permanent seasonal closure of the MRA Wedge by soliciting public input in September 2022. Before any permanent closure could be implemented, NMFS extended the emergency closure during the consecutive hotspot season in 2023 ("2023 Emergency Rule"). Plaintiff Massachusetts Lobstermen's Association ("MALA") challenged the 2023 Emergency Rule in the District Court for the District of Columbia. That court denied MALA's motion for a temporary restraining order because MALA failed to demonstrate irreparable harm.

Then, after a proposed rule and public comment period, on February 7, 2024, NMFS published a final rule closing the MRA Wedge to lobster and Jonah crab fishing annually from February 1 through April 30 ("Final Wedge Rule") to reduce right whale mortality and serious injury ("M/SI") under the MMPA. MALA now asks this Court for the extraordinary remedy of a preliminary injunction to bar the Final Wedge Rule from going into effect on March 8. But Plaintiff has failed to satisfy its burden to demonstrate that it warrants a preliminary injunction.

First, Plaintiff has once again failed to demonstrate irreparable harm. As in *MALA v. NMFS*, No. 1:23-cv-293 (D.D.C.), Plaintiff offers nothing more than vague and speculative statements about the alleged harm that the Final Wedge Rule would cause it and its members, and therefore does not come close to meeting its burden to show likely and significant harm necessary to succeed on a preliminary injunction.

Second, Plaintiff is not likely to succeed on the merits. Plaintiff fundamentally misinterprets the provisions in the Consolidated Appropriations Act, 2023 ("CAA") pertaining to NMFS' regulation of the lobster fishery. The CAA established that the 2021 TRP Amendment Rule was "sufficient" to ensure that the lobster fishery complied with the Endangered Species Act ("ESA") and MMPA through December 31, 2028. But Congress carved out an exception for NMFS to "make final an emergency rule that is in place on the date of" the CAA's enactment. Congress could only have been referring to the 2022 Emergency Rule, as it was the only emergency rule implemented under the MMPA or any other relevant statute affecting the lobster fishery at the time. Plaintiff's contrary reading—that there was no rule "in place" at the time of enacting the CAA but that Congress believed NMFS *might* publish a new emergency rule concerning right whales and lobster fishing between the time Congress passed the CAA and the President signed it—is implausible. For starters, NMFS could not have taken regulatory action in

that short time span. More importantly, the 2022 Emergency Rule was still "in place" at the end of 2022 because the regulatory gap in the MRA Wedge remained and NMFS retained emergency authority under the MMPA. Plaintiff's interpretation improperly renders the exception provision superfluous. Plaintiff's other merits argument about the D.C. Circuit's ruling on a separate agency action is irrelevant because the Final Wedge Rule was implemented under a different statute using different scientific support.

Additionally, the balance of the hardships and public interest factors tip sharply in favor of the Defendants. A right whale found dead last month entangled in U.S. lobster gear on Martha's Vineyard illustrates that whales are still being killed and seriously injured by lobster gear. Plaintiff has not shown any concrete harm will occur to its members during the MRA Wedge closure. On the other hand, the requested injunction would harm Defendants by preventing NMFS from implementing a crucial entanglement risk reduction measure pursuant to NMFS' duty under the MMPA and placing endangered right whales at significant risk annually. Issuing a preliminary injunction would also subvert Congress' desire to allow NMFS to issue the Final Wedge Rule. For these reasons, and those that follow, the Court should deny Plaintiff's Motion.

## LEGAL FRAMEWORK

## I.    Marine Mammal Protection Act

Congress enacted the MMPA in 1972 to ensure that marine mammals are not "permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. § 1361(2). MMPA Section 118 governs the "incidental taking" of marine mammals during commercial fishing operations. *Id.* § 1387(a). MMPA Section 118(f) requires the Secretary to "develop and implement a take reduction plan designed to assist in the recovery or prevent the depletion of each strategic stock" which interacts

with certain commercial fisheries. *Id.* § 1387(f)(1). A take reduction team composed of individuals with expertise in the conservation or biology of the marine mammal or the fishery at issue recommends a take reduction plan for consideration by the Secretary. *Id.* § 1387(f)(6)(C), (7)(A). Congress instructed that NMFS "shall . . . prescribe emergency regulations" for species with an established take reduction plan, "[i]f [NMFS] finds that the incidental [M/SI] of marine mammals from commercial fisheries is having, or is likely to have, an immediate and significant adverse impact on a stock or species." *Id.* § 1387(g)(1). NMFS may extend emergency regulations "for an additional period of not more than 90 days or until reasons for the emergency no longer exist, whichever is earlier" if NMFS determines that M/SI from a commercial fishery "is continuing to have an immediate and significant adverse impact on a stock or species." *Id.* § 1387(g)(4).

## II.    Consolidated Appropriations Act, 2023

On December 23, 2022, Congress passed the CAA, and on December 29, 2022, President Biden signed the CAA, which included a provision specific to NMFS' regulation of the lobster and Jonah crab fisheries to protect right whales. Pub. L. No. 117-328, Div. JJ, Tit. I, 136 Stat. 4459, 6089-90. In Section 101(a), the CAA deems the 2021 TRP Amendment Rule "sufficient to ensure that the continued Federal and State authorizations of the American lobster and Jonah crab fisheries are in full compliance" with the MMPA and the ESA until December 31, 2028. *Id.* § 101(a). In Section 101(b), Congress carved out an exception, stating that the 101(a) provisions "shall not apply to an existing emergency rule, or any action taken to extend or make final an emergency rule that is in place on" the date of enactment that affects the American lobster and Jonah crab fisheries. *Id.* § 101(b). The only emergency rule for the lobster fishery in the relevant time period—indeed the only emergency rule that NMFS has ever promulgated for the lobster fishery—was its 2022 Emergency Rule.

**FACTUAL BACKGROUND**

**I.      North Atlantic Right Whale**

The North Atlantic right whale (*Eubalaena glacialis*) has been listed as endangered since 1970 and has been protected by the MMPA's take moratorium since 1972.[1] *See* 35 Fed. Reg. 18319 (Dec. 2, 1970). The right whale population has been in decline since 2010 as a result of human-caused mortality from entanglement in fishing gear and vessel strikes. 89 Fed. Reg. 8333, 8333 (Feb. 7, 2024). The right whale population is approximately 356 individuals as of 2022. *Id.*

Right whales are "strategic stocks," 16 U.S.C. § 1362(19), a designation that requires NMFS to develop and implement a take reduction plan under the MMPA. *See* 16 U.S.C. § 1387(f). NMFS first developed a take reduction plan for right whales in 1997, titled the Atlantic Large Whale Take Reduction Plan ("TRP"). 62 Fed. Reg. 39157 (July 22, 1997). NMFS established the Atlantic Large Whale Take Reduction Team ("TRT") in 1997 to develop recommendations for the TRP. *Id.*; 16 U.S.C. § 1387(f)(6)(A)(i). Plaintiff is a member of the TRT.

**II.     The 2021 Atlantic Large Whale Take Reduction Plan Amendment Rule**

NMFS reconvened the TRT in 2017 to address a rapidly declining right whale population by mitigating entanglements. 86 Fed. Reg. 51970, 51970-71 (Sept. 17, 2021). After extensive debate, negotiations, and input from affected stakeholders including state fishery agencies, on September 17, 2021, NMFS published the 2021 TRP Amendment Rule. *See generally* NOAA_00075-129.[2] As relevant here, the 2021 TRP Amendment Rule changed the geographic scope of the existing seasonal Massachusetts Restricted Area closure in the TRP by expanding the closure area in Massachusetts state waters from its prior boundary northward to the New

---

[1] For relevant background concerning the ESA, *see MALA v. NMFS* (Dkt. 22 at 2-3).

[2] Citations to "NOAA_XXXXX" documents refer to Bates-stamped pages in NMFS' administrative record.

Hampshire border. NOAA_00124-25; *see also* Declaration of Colleen Coogan ("Coogan Decl.") at Fig. 1 (map of MRA Wedge).

### III.    Litigation Challenging the 2021 TRP Amendment Rule and Biological Opinion

NMFS' issuance of the 2021 TRP Amendment Rule and a distinct 2021 Biological Opinion on the authorization of certain U.S. commercial fisheries prompted litigation from conservation groups interested in protecting right whales, as well as the State of Maine and groups associated with the lobster industry. *See Ctr. for Biological Diversity v. Raimondo*, No. 18-cv-112 (D.D.C.) ("*CBD*") (dismissed as moot, Dkt. 260-261); *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers v. Raimondo*, No. 1:21-cv-275-LEW (D. Me.) (granting of preliminary injunction reversed and vacated by 40 F.4th 36 (1st Cir. 2022) then voluntarily dismissed); *Me. Lobstermen's Ass'n v. NMFS*, No. 1:21-cv-2509 (D.D.C.) ("*MLA I*").[3] On appeal of *MLA I*, the U.S. Court of Appeals for the District of Columbia Circuit vacated the 2021 Biological Opinion. *MLA v. NMFS*, 70 F.4th 582, 586 (D.C. Cir. 2023) ("*MLA II*").

### IV.    NMFS' 2022 and 2023 Wedge Closures

After the 2021 TRP Amendment Rule went into effect, DMF sent NMFS a letter on January 7, 2022, to alert NMFS to an emerging entanglement risk. NOAA_05750. The expansion of a seasonal closure in state waters by Massachusetts in 2021, and the subsequent incorporation of that closure into the 2021 TRP Amendment Rule, inadvertently left an unprotected wedge-shaped area with high risk of overlap between right whales and vertical buoy lines. NOAA_00175. With the implementation of the new boundaries of the MRA, approximately 200 square miles of Federal

---

[3] In *MLA I*, Plaintiff noted that right whales "remain at risk" and praised the Massachusetts state-water closures adjacent to the MRA Wedge as the "single most important conservation mechanism in existence for supporting" the right whale. *MLA I* (Dkt. 24-1 ¶¶ 5, 6); *see also CBD* (Dkt. 234 at 10). Plaintiff also lauded Massachusetts' "seasonal three-month closure [adjacent to MRA Wedge] . . . [for] dramatically reduc[ing] risk" to right whales. *MLA I* (Dkt. 24-4 ¶ 9).

waters remained open to trap/pot fishing between state and Federal closures, creating the MRA Wedge, where 2021 and 2022 data indicated that lobstermen were taking advantage of the open wedge area to wet store and concentrate their trap/pot gear during the closure period, creating an unusually high density of gear in that area. *Id.*

During April 2021 aerial surveys, the Center for Coastal Studies ("CCS") observed aggregated fishing gear and right whales within the MRA Wedge. *Id.*; Coogan Decl. ¶¶ 13, 15, Figs. 2-4. NMFS understood the gear in the MRA Wedge to be a mix of (a) actively fished gear and (b) wet-stored gear in preparation for the May opening of adjacent waters. NOAA_00175. Based on the confirmed presence of right whales alongside aggregated gear, NMFS determined that the MRA Wedge presented an imminent entanglement threat. *Id.* NMFS issued the 2022 Emergency Rule to prohibit trap/pot fishery buoy lines within the MRA Wedge to reduce the incidental M/SI to right whales. *See* NOAA_00173. Due to the time required to prepare the 2022 Emergency Rule, the closure was in effect for the month of April 2022. NOAA_05727. After the CAA was passed in December 2022, NMFS extended the 2022 closure with the 2023 Emergency Rule, which closed the MRA Wedge during the entire hotspot season from February 1 to April 30 and reopened May 1, 2023. *Id.* On February 7, 2024, NMFS made the 2022 Emergency Rule final with the Final Wedge Rule at issue here. 89 Fed. Reg. 8333 (NOAA_05725-41).

## V.    Plaintiff's Unsuccessful Motion for a Temporary Restraining Order Concerning the 2023 Emergency Rule.

With its 2023 Emergency Rule, NMFS extended the 2022 Emergency Rule consistent with MMPA Section 118(g)(4) and the exception provided by Section 101(b) of the CAA. *See* NOAA_05033.[4] On February 1 and 2, 2023, Plaintiff MALA filed a complaint and motion for a

---

[4] NMFS did so in response to concerns expressed by the Commonwealth of Massachusetts. The same concerns as those necessitating the 2022 Emergency Rule were present, and new right whale

temporary restraining order ("TRO") and preliminary injunction in the U.S. District Court for the District of Columbia, seeking to enjoin the 2023 Emergency Rule. *MALA v. NMFS*, Dkt. 1, 2. Plaintiff's 2023 motion was substantially similar to the Motion at bar. Chief Judge Boasberg denied Plaintiff's motion for a TRO, finding that Plaintiff failed to establish irreparable harm. *Id.* (02/16/23 Min. Order); 02/16/2023 Hearing Trans. at 30 ("I am talking about more than de minimus harm, harm that is significant, and there's simply no proof of that. The harm is very cursorily and vaguely described."), 31 ("So I think that in the weighing of all the factors, that the plaintiff[ ] ha[s] not been able to show irreparable harm dooms this motion and I will deny it."). The court gave Plaintiff an opportunity to file a preliminary injunction motion with additional testimony substantiating irreparable harm. *Id.* at 31. Plaintiff chose not to do so and also chose not to appeal. After the MRA Wedge opened on May 1, 2023, NMFS successfully moved to dismiss the case as moot. *MALA v. NMFS,* Dkt. 40.

## STANDARD OF REVIEW

Injunctive relief is an "extraordinary and drastic remedy . . . that is never awarded as of right," *Voice of the Arab World v. MDTV Med. News Now*, 645 F.3d 26, 32 (1st Cir. 2011), but "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must demonstrate four elements: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent injunctive relief; (3) a balancing of hardships; and (4) public interest weighing in favor of granting the injunction. *Respect Me. PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (citing *Nken v. Holder*, 556 U.S. 418, 433 (2009)). "The first two factors are the most important."

---

detections data from 2022 confirmed the presence of right whales in the MRA Wedge from February through April. *Cf.* Coogan Decl. ¶¶ 13-15, Figs. 2-4.

*Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (citing *Nken*, 556 U.S. at 434). The moving party "bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

## ARGUMENT

### I.    Plaintiff Has Not Shown It Is Likely to Suffer Irreparable Harm.

"[I]irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief." *Charlesbank Equity Fund II v. Blinds To Go,* 370 F.3d 151, 162 (1st Cir. 2004). "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009). Although the "measure of irreparable harm" can be a sliding scale, "working in conjunction with a moving party's likelihood of success on the merits," *Vaqueria Tres Monjitas, Inc., v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009), the movant's showing must "possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). Rather, a movant must show "that he is *likely* to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20 (emphasis added). As with its 2023 injunction motion, Plaintiff's amorphous speculations about possible harm fall far short of the required showing. Accordingly, the Court can deny Plaintiff's Motion on that basis without reaching the other preliminary injunction elements.

Plaintiff's primary argument that it need not demonstrate the essential element of irreparable harm because it seeks to enforce a statute — "the CAA, and therefore the APA" — inaccurately states the law. Dkt. 13 at 18 ("Mot."). None of the cases Plaintiff cites establish that, if the moving party shows a constitutional or statutory violation, then the court will presume the existence of irreparable harm. In *Doe 1-6 v. Mills*, where the plaintiff had *failed* to show a statutory

violation had taken place, the court found no need to assess the potential for irreparable harm flowing from the statute's enforcement. 16 F.4th 20, 37 (1st Cir. 2021). In *Newell Company v. Connolly*, the court concluded that the plaintiff had demonstrated a likelihood of success on the merits of its statutory claim. 624 F. Supp. 126, 127-28 (D. Mass. 1985). It went on to separately review a proffered declaration and conclude that the statute imposed "very substantial burdens on" non-compliant companies. *Id.* In neither case did the court presume, as Plaintiff posits, the *per se* existence of irreparable harm simply because the plaintiff had demonstrated a likelihood of success on the merits. To do so, would negate one of the four prongs and thus run head-long into *Winter*.

Nor do any of Plaintiff's other cited cases support their presumption of irreparable harm. *See United States v. D'Annolfo*, 474 F. Supp. 220, 222 (D. Mass. 1979) ("When the *government* acts to enforce a statute or make effective a declared policy of Congress, the standard of public interest and not the requirements of private litigation measure the propriety and need for injunctive relief." (emphasis added)); *Long Term Care Pharm. All. v. Ferguson*, 260 F. Supp. 2d 282, 289 (D. Mass. 2003) (interpreting *D'Annolfo* to apply to any plaintiff attempting to enforce a statute in case where clear procedural violations of Medicaid Act were evident and harm inflicted on "persons [the statute was] designed to serve and protect"), *vacated and remanded by* 362 F.3d 50 (1st Cir. 2004). Unlike in *D'Annolfo* or *Long Term Care Pharmacy Alliance*, MALA is neither a government entity nor the intended beneficiary of the MMPA, the statute under which NMFS promulgated the Final Wedge Rule. Nor does this case involve a time-sensitive acquisition subject to the Massachusetts Anti-Takeover Act, or a failure to do APA-required notice and comment. Mot. at 18 (citing *Hyde Park Partners v. Connolly*, 676 F. Supp. 391 (D. Mass. 1987), *Monahan v. Winn*, 276 F. Supp. 2d 196, 212 (D. Mass. 2003)). Notably, in each of Plaintiff's cited cases, the

court analyzed all four injunction factors. The court never found an alleged statutory violation that would *alone* mandate a finding of irreparable harm.

Supreme Court and First Circuit precedent is clear. Even if Plaintiff has demonstrated a statutory violation (which it has not), "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982); *see also United States v. Mass. Water Res. Auth.*, 256 F.3d 36 (1st Cir. 2001) (same). Unless there is a "clear legislative command" that a court shall not use "traditional balancing principles," the plaintiff must still demonstrate likelihood of irreparable harm apart from any alleged statutory violation. 256 F.3d at 45; *see also Water Keeper All. v. U.S. Dep't of Def.*, 271 F.3d 21 (1st Cir. 2001) (noting district court correctly required that plaintiff show potential for irreparable harm separate and apart from harm they argued was inherent in procedural violation of ESA's consultation requirements).

Plaintiff's only substantive irreparable harm argument is nearly identical to the one that the *MALA v. NMFS* court already rejected—that the Final Wedge Rule will "limit [Plaintiff's] members' ability to fish and generate income, thus reducing [Plaintiff's] income generated by dues[.]" *Compare* Mot. at 17, *with MALA v. NMFS*, Dkt. 2 at 22.[5] This time, Plaintiff does not cite to its attached declarations in support of this assertion, but even if had, both declarations rely on conclusory statements and generalizations. For instance, Mr. Sawyer claims the Final Wedge Rule will result in "lobstermen losing large sums," Dkt. 13-1 ("Sawyer Decl.") ¶ 14. Mr. Meschino states that he will "lose a significant portion" of income, Dkt. 13-2 ("Meschino Decl.") ¶ 12. Both speculate that the losses could "force[]" closure of their businesses. Sawyer Decl. ¶ 16; Meschino

---

[5] Indeed, the declarations filed in *MALA v. NMFS* and found to be insufficient in that case are nearly identical to those filed here. *Compare* Dkt. 13-1, 13-2, *with MALA v. NMFS*, Dkt. 4, 5.

Decl. ¶ 14. Yet, neither declarant provides concrete data, numbers, or business records to support their statements. Even though Plaintiff had the opportunity to quantify and document any alleged loss resulting from the 2023 Emergency Rule, Plaintiff now merely offers one conclusory sentence that the 2023 Emergency Rule "harmed [Mr. Meschino] financially and significantly disrupted [his] income." Meschino Decl. ¶ 10. Furthermore, neither declarant discusses why the lobstermen could not move to adjacent open fishing areas during the three months the MRA Wedge is closed, thereby alleviating any losses. In fact, the vast majority of Lobster Management Area 1 ("LMA1"), which includes the MRA Wedge and extends well beyond the MRA, remains open to fishing for LMA1 permit holders (the relevant permit needed to fish the MRA Wedge) during the closure. Coogan Decl. ¶ 26; *see also id.*, Fig. 6 (map showing MRA Wedge is small part of LMA1). Nor is there evidence to support Plaintiff's suggestions that the Final Wedge Rule will cause a permanent loss of Plaintiff's rights to fish in the closed area even after its reopening. *Cf. Dist. 4 Lodge of Int'l Ass'n of Machinists & Aerospace Workers v. Raimondo*, 18 F.4th 38, 48 (1st Cir. 2021) (rejecting similar argument). Plaintiff's conclusory statements cannot meet the high standard for irreparable injury. *Winter*, 555 U.S. at 22.

Additionally, neither declaration includes any statement about the likelihood of members not paying dues. Plaintiff's speculation that the Final Wedge Rule will "reduc[e] MLA's income generated by dues" is precisely the type of "unsubstantiated fears of what the future may have in store" that the First Circuit has found inadequate. *Charlesbank Equity Fund*, 370 F.3d at 162. In sum, because Plaintiff has "largely repeated their prior unsuccessful arguments" and "made virtually no effort to show irreparable harm," the Court need go no further and should deny Plaintiff's motion on this ground alone. *Together Emps.*, 32 F.4th at 86; *see also Charlesbank Equity Fund*, 370 F.3d at 162-63.

## II.    Plaintiff Is Not Likely to Succeed on the Merits.

The Administrative Procedure Act ("APA") governs judicial review of NMFS' MMPA and CAA decisions. 16 U.S.C. § 1374(d)(6); 5 U.S.C. §§ 701-706. Agency action can be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Contrary to Plaintiff's assertion, the Final Wedge Rule is consistent with CAA Section 101(b), which carves out a specific exception for "any action taken to . . . make final an emergency rule that is in place on the date of enactment of this Act, affecting lobster and Jonah crab." CAA § 101(b); NOAA_05736. NMFS' 2022 Emergency Rule was promulgated on March 2, 2022 and was never repealed. When NMFS issued the 2022 Emergency Rule, it made clear that the "reasons for the emergency" were not likely to abate in the near or medium term. NOAA_00175; 16 U.S.C. § 1387(g)(4). NMFS determined that the MRA Wedge was a "critical gap in protection where right whale distribution information identifies a high risk of overlap between right whales and buoy lines." NOAA_00175; *see also* Coogan Decl. ¶¶ 13-15, Figs. 2-4. And because Massachusetts' state water closures and Federal water closures under the 2021 TRP Amendment Rule were set to occur each year, the increased risk of right whale entanglement in the MRA Wedge regulatory gap would recur annually. Coogan Decl. ¶¶ 14, 16. In a Federal Register notice in September 2022, NMFS solicited public input on its MRA Wedge management strategy to seasonally close the MRA Wedge from February through April and open it from May through January, as part of anticipated TRP modifications. Coogan Decl. ¶ 17; *see also* 87 Fed. Reg. 55405, 55408 (Sept. 9, 2022). It was, therefore, public knowledge and expectation that NMFS intended to extend the 2022

Emergency Rule to include subsequent seasons or make it a permanent part of the seasonal MRA closure. Coogan Decl. ¶ 17. The 2024 Final Wedge Rule makes final the 2022 Emergency Rule by permanently including the MRA Wedge in the seasonal closure,[6] consistent with public expectation and Congress' expectation outlined in the CAA.[7]

Plaintiff's argument to the contrary—that Congress meant to ignore the facts on the ground and enact a null set exception in CAA Section 101(b) because, in Plaintiff's view, the 2022 Emergency Rule was no longer "in place" after April 30, 2022, and no emergency rule "existed" on December 29, 2022—is illogical. Mot. at 3, 8, 10, 12-13, 15. To start, Plaintiff confuses the terms "in place" with "in effect." Congress exempted any action to "make final" an emergency rule that is "in place" on December 29, 2022. CAA § 101(b). NMFS never repealed the 2022 Emergency Rule and the seasonal emergency created by the regulatory gap remained. When the waters reopened in May, the 2022 Emergency Rule was no longer in effect, but NMFS retained emergency rulemaking authority to issue an extension under MMPA Section 118(g)(4). *But see*

_____

[6] Plaintiff incorrectly asserts that the Final Wedge Rule is a geographical and temporal expansion of the 2022 Emergency Rule. Mot. at 12 n. 6, 16. The geographic boundaries are the same. *See* Coogan Decl. ¶ 21, 22. As to the temporal scope, stakeholders understood that the regulatory gap created an emergency of a 3-month duration. *Cf.* NOAA_05742, NOAA_5750, NOAA_5758. Just because NMFS was not always able to implement a closure for the entire duration does not change the timing of the emergency. Plaintiff's citation to *Starbound, LLC v. Gutierrez* is inapt because that out-of-circuit case involved emergency action taken under a different statute—the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq*. Motion at 12 (citing 2008 WL 1752219 (W.D. Wash. Apr. 15, 2008)).

[7] Likewise, the 2023 Emergency Rule extended the closure to the consecutive hotspot season, consistent with public expectation, the MMPA, and the CAA. Plaintiff misplaces reliance on an informal statement by a single NMFS employee about the 2023 Emergency Rule. Mot. at 11. First, that statement is irrelevant because it concerns the 2023 Rule, which is not at issue in this case. Second, informal statements made by a single agency employee cannot be construed as representations by the agency. *Cf. Schweiker v. Hansen*, 450 U.S. 785, 789–90 (1981) (holding that the Social Security Administration was not estopped by the erroneous statement of an employee). Plaintiff's reference to a sablefish rule as a valid "extension" compared to the 2023 Emergency Rule, Mot. at 12, is inapt because NMFS promulgated that rule under the MSA.

NOAA_5739 n.7 (explaining NMFS does not retain MMPA extension authority *ad infinitum*). Thus, the 2022 Emergency Rule was still "in place" in December 2022, as Congress carefully articulated. CAA § 101(b); NOAA_05736.

Second, Plaintiff's interpretation runs headlong into the rule of statutory construction requiring this Court to give effect to all statutory provisions. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"). Congress's intent is clear considering that the 2022 Emergency Rule is the *only* emergency rule "affecting lobster and Jonah crab" that NMFS has issued in at least the last decade. NOAA_05736. If Section 101(b) did not apply to the 2022 Emergency Rule, then the exception provision would be entirely superfluous. Plaintiff should not be permitted to write Section 101(b) out of the CAA.[8]

Third, Plaintiff's reading would create an unnecessary conflict between Congress's intentions expressed in the MMPA and the CAA. Congress expressly declared it the policy of the United States to protect marine mammals within its jurisdiction. 16 U.S.C. §§ 1361(1), (2), (6), 1371(a), 1372(a), 1387(f)(2). The CAA did not negate that intention; it simply established Congress' preferred path for achieving those protections for right whales impacted by the lobster fishery. The Court should reject Plaintiff's flawed logic, which would vitiate CAA Section 101(b) and that part of Section 101(a) specifically carving out an emergency rule exception. *See* CAA § 101(a) ("Notwithstanding any other provision of law *except as provided in subsection (b)* . . . .")

---

[8] Plaintiff's theory that Congress' exception meant to allow NMFS to "issue[] any number of emergency regulations" concerning right whales and lobster fishing in the five days between when Congress passed the CAA and the President signed it, Mot. at 15-16, ignores the lengthy bureaucratic reality of promulgating an emergency rule. NOAA_05738; Coogan Decl. ¶ 19.

(emphasis added). NMFS' interpretation is the best reading of the law, and the Court should decline to adopt a reading of the statute that would render Section 101(b) meaningless surplusage.[9]

Plaintiff's remaining argument that the Final Wedge Rule is based on "worst case scenarios" and runs counter to the D.C. Circuit's decision in *MLA II* is based on a faulty premise. Mot. at 17 (citing 70 F.4th at 596-97). The *MLA II* ruling addressed an entirely separate agency action under an entirely different statute—an ESA Section 7 consultation concerning Federal authorization of the lobster fishery that involved gaps in data pertaining to issues like allocation of entanglements between countries. NOAA_05736. The rule at issue here, based on empirical data and a separate ESA consultation, is one of those "realistic cases" where NMFS was able to "make a scientifically defensible decision without resort to a presumption in favor of the species." *MLA II*, 70 F.4th at 600. Accordingly, the holding in *MLA II* is not relevant to the Final Wedge Rule.

Plaintiff fails to grapple with the fact that right whale sightings, acoustic surveys inside the MRA Wedge Area, and vertical buoy-line fishing gear density data were the primary sources of evidence NMFS considered when issuing the Final Wedge Rule. NOAA_05727, 05731-32; Coogan Decl. ¶ 23. Indeed, those data were in themselves sufficient to support the decision to close the MRA Wedge seasonally. *Id.*[10] In sum, the Final Wedge Rule applies the best available scientific information, including recent empirical sightings of right whales. It does not consider

---

[9] Plaintiff's reading also fails when Section 101(b) is considered in the context of all CAA provisions addressing right whales. Congress directed NMFS to, *inter alia*, facilitate development of new gear technologies and submit annual reports on actions taken to reduce harm to right whales before 2028. CAA §§ 101(a)(1)-(3), 203(a)(1). It would be an odd reading of the statute if Congress exhorted NMFS to take steps to sustain right whale numbers into the future, at the same time as intending to preclude NMFS from finalizing the one emergency rule issued in decades that provides empirically based protections.

[10] NMFS used an updated version of the Decision Support Tool ("DST") as a secondary line of evidence for the Final Wedge Rule. Coogan Decl. ¶¶ 24-25. The updated DST differs substantially from the one informing the 2021 Biological Opinion at issue in *MLA I* and *MLA II*. *Id.*

worst-case scenarios and is supported by its own separate ESA consultation and administrative

record. NOAA_5736; Coogan Decl. ¶ 23-24. For all these reasons, Plaintiff is not likely to succeed

on the merits of its claims brought under the APA and CAA (Counts I-III).[11]

### III.   The Balance of Harms and Public Interest Do Not Support Plaintiff's Request for Emergency Relief.

Plaintiff also has failed to meet the third and fourth factors of the preliminary injunction

test—balancing the equities and the public interest—which "merge when the Government is the

opposing party." *Nken*, 556 U.S. at 435. In considering the balance of the equities between the

parties, traditionally a court "must balance the competing claims of injury and must consider the

effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24

(quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). "[W]here an injunction

is asked [for] which will adversely affect a public interest . . . the court may in the public interest

withhold relief until a final determination of the rights of the parties, though the postponement may

be burdensome to the plaintiff." *Weinberger*, 456 U.S. at 312-13. Thus, if an injunction would be

contrary to the public interest, a court may deny injunctive relief even when a plaintiff has

demonstrated the other preliminary injunction factors, which is not true in this case.

### A.   The balance of harms weighs against an injunction.

As discussed above, Plaintiff fails to meet its high burden of showing that it is likely to be

irreparably harmed in the absence of an injunction. Therefore, Plaintiff cannot prove that the

balance of harm tips in its favor. By contrast, if any species should weigh heavily on the scale,

both literally and figuratively, it is the right whale. As one of the world's most endangered species

---

[11] Plaintiff asserts six claims, Dkt. 1 at 16-21, but its injunction motion only argues for success on the merits of its first, second, and third claims. Counts 1-3, Mot. at 8-17. Plaintiff has therefore waived any argument that it is likely to succeed as to Counts 4-6. *See Young v. Wells Fargo Bank*, 717 F.3d 224, 239-40 (1st Cir. 2013) ("arguments not raised in an opening brief are waived").

with approximately 356 individuals remaining, under the MMPA, right whales have a potential biological removal level of less than one M/SI per year by U.S. commercial fisheries. That means that even a single M/SI within the year would appreciably reduce the species' ability to recover to its optimum sustainable population level and would cause population-level harm. 16 U.S.C. § 1362(20); *Cf.* Coogan Decl. ¶ 5. In cases involving imperiled species such as the right whale, courts in this circuit and many others have found that the balance of interests "tips *heavily* in favor of protected species." *Strahan v. Coxe*, 127 F.3d 155, 160 (1st Cir. 1997) (emphasis added). Not surprisingly, in circumstances similar to those here, the First Circuit found that preventing NMFS from effectuating a necessary seasonal area closure may itself result in irreparable harm to right whales, contrary to the MMPA. *See Dist. 4 Lodge*, 18 F.4th at 47-48.

Plaintiff's assertion that harm to right whales from an injunction would "likely [] be nonexistent," Mot. at 19, is easily undermined by the January 2024 death of a young female right whale entangled in U.S. lobster trap/pot buoy line, Coogan Decl. ¶ 4, and the last five years of survey data demonstrating right whale use of the MRA Wedge. *Id.* ¶¶ 13, 15, Fig. 4. Right whales were frequently sighted in February through April of 2018 through 2022 by dedicated aerial and shipboard surveys conducted by the CCS,[12] Northeast Fisheries Science Center, and Stellwagen Bay National Marine Sanctuary, and opportunistic sightings. NOAA_05730 (Fig. 3); Coogan Decl. ¶ 15, Fig. 4. For example, the Northeast Fisheries Science Center sighted more than 40 right whales (approximately 10% of entire population) during a single day in the MRA Wedge. Coogan Decl. ¶ 15. Meanwhile, on April 19, 2021; April 28, 2021; February 6, 2022; and March 11, 2022, the CCS observed a vast quantity of vertical buoy line fishing gear in the MRA Wedge.

---

[12] Plaintiff's CCS citation from January 9, 2024 is irrelevant, as it says nothing about the presence of right whales in the MRA Wedge from February through April. Mot. at 6.

NOAA_05729 (Fig. 2); Coogan Decl. ¶ 13, Figs. 2-3. In addition to survey data, NMFS calculated the risk of right whale entanglement using an updated version of a peer-reviewed model called the DST and found that leaving the MRA Wedge open represents, at minimum, 13-16.5 percent of the total remaining risk of entanglement posed by vessels in open lobster fishing waters off the coast of Massachusetts. NOAA_05732; *cf. Dist. 4 Lodge of Int'l Ass'n of Machinists & Aerospace Workers v. Raimondo*, 40 F.4th 36 (1st Cir. 2022) (upholding implementation of a seasonal lobster fishing closure in LMA1 where DST calculated risk of right whale entanglement). Consistent with the statements made by DMF in their letters requesting this MRA Wedge closure, NMFS independently determined using the best available scientific information that the MRA Wedge closure is necessary to reduce right whale M/SI from entanglement. Plaintiff's unsupported speculations about the ineffectiveness of the closure do not hold water. The Court should find this factor favors NMFS because here, the agency's action "is aimed at effectuating a congressional command to avoid licensing activity that may itself cause irreparable harm: the extinction of a marine mammal species." *Dist. 4 Lodge*, 18 F.4th at 47; *see also id.* ("[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alterations in original)).

Plaintiff confuses the relevant legal burden by citing to out-of-circuit case law about the take of a single animal not equating to irreparable harm. *See* Mot. at 19-20. Additionally, Plaintiff speculates about the "collapse of the [lobster] industry" that would, in turn, "destroy numerous" Massachusetts communities to establish harm to others. *Id.* at 19. Yet again, Plaintiff fails to support its hyperbole with any declarations, statistics, or actual data to show that a seasonal closure of a limited area of Federal waters will lead to such predicted dire results, even though closures are common in lobster and other fisheries. As the moving party, Plaintiff bears the high burden of

demonstrating that it meets each element of the preliminary injunction standard. *Winter*, 555 U.S. at 20. Defendants need only show that, on balance, the scale tips in favor of Defendants' position, not that harm to the species rises to the "irreparable harm" level. Yet, even if Defendants did need to establish a risk of irreparable harm to the species from an injunction, the population-level damage that could result from a single M/SI in the MRA Wedge clearly meets that standard.

      **B.**      **Allowing the Final Wedge Rule to go into effect is in the public interest.**

An injunction would allow substantial risk of right whale entanglement in the MRA Wedge to go unchecked, undermining NMFS' efforts to protect the species under the MMPA. While NMFS alone has the authority to implement the Final Wedge Rule, other parties have expressed a strong interest in the closure. For example, DMF strenuously advocated for the closure in letters sent to NMFS in January 2022, December 2022, January 2023, and August 2023. *See* NOAA_05742, NOAA_05750, NOAA_05744, NOAA_05758. An injunction would work against the decided interest of the public in protecting right whales from a high risk of entanglement.

Plaintiff's public interest arguments rely entirely on faulty legal theories made earlier in its brief. Taking its legal conclusion (*i.e.*, that the Final Wedge Rule is unlawful) as factual, Plaintiff argues that there is no public interest from unlawful agency action. Mot. at 18-20. However, as explained above, the Final Wedge Rule was properly promulgated under the MMPA, the CAA, and the APA, and does not conflict with the D.C. Circuit's ruling in *MLA v. NMFS*. To the contrary, an injunction preventing the MRA Wedge closure would contradict the goals of the MMPA. Thus, the public interest tips in Defendants' favor.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff has failed to meet its burden on any of the required preliminary injunction factors. Therefore, the Court should deny Plaintiff's Motion.

Date: February 23, 2024            Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

*/s/ Taylor A. Mayhall*
TAYLOR A. MAYHALL (MN Bar 0400172)
*Trial Attorney*
J. BRETT GROSKO
*Senior Trial Attorney* (Md. Bar)
Wildlife and Marine Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
TEL: (202) 305-0342
FAX: (202) 305-0275

*Counsel for Defendants*

*Of Counsel*

Sam Duggan, Attorney-Advisor
NOAA Office of General Counsel
Silver Spring, Maryland

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Taylor A. Mayhall*
*Attorney for Defendants*

22