```
 1                UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS (Boston)

 3                             No. 1:24-cv-10332-WGY

 4

 5   MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, INC.,
               Plaintiff
 6

 7   vs.

 8

 9   NATIONAL MARINE FISHERIES SERVICE (NMFS), et al,
               Defendants
10

11                       *********

12

13                    For Hearing Before:
                      Judge William G. Young
14

15                    TRO/Stay (Continued.)

16

17                    United States District Court
                      District of Massachusetts (Boston)
18                    One Courthouse Way
                      Boston, Massachusetts 02210
19                    Thursday, March 14, 2024

20                       ********

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23                United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
24                    rhrbulldog@aol.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3   DANIEL J. CRAGG, ESQ.
     SAMUEL P. BLATCHLEY, ESQ.
 4   ROBERT T. DUBE, JR., ESQ.
        Eckland & Blando
 5      800 Lumber Exchange Building
        10 South Fifth Street
 6      Minneapolis, MN 55402
        (612) 236-0160
 7      Email: Dcragg@ecklandblando.com
        For plaintiff
 8

 9

10   TAYLOR MAYHALL, ESQ.
     JOHN BRETT GROSKO, ESQ.
11      DOJ-Enrd
        Wildlife and Marine Resources Section
12      Ben Franklin Station, P.O. Box 7611
        Washington, DC 20044-7611
13      (202) 598-3796
        Email: Taylor.mayhall@usdoj.gov
14      For defendants, the United States

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          P R O C E E D I N G S
 2          (Begins, 1:45 p.m.)
 3          THE CLERK:  Now hearing Civil Matter 24-10332, the
 4   Massachusetts Loberstermen's Association vs. National
 5   Marine Fisheries.
 6          THE COURT:  Good afternoon.  Would counsel
 7   identify themselves, starting with the plaintiff.
 8          MR. CRAGG:  Good afternoon, your Honor, Daniel
 9   Cragg, C-R-A-G-G, on behalf of the plaintiff, the
10   Massachusetts Lobstermen's Association, and with me is
11   Robbie Dube and Samuel Blatchley, also a representative
12   of our client, Eric Meschino.
13          THE COURT:  Good afternoon.
14          MS. MAYHALL:  Good afternoon, your Honor, Taylor
15   Mayhall on behalf of the United States.  And with me at
16   counsel table I have Brett Grosko and Agency Counsel Sam
17   Duggan.
18          THE COURT:  Thank you.  Let me tee this up.
19          At our last meeting, I, pursuant to Rule 65(a), I
20   collapsed a further hearing with trial on the merits.
21   This afternoon's meeting is the commencement of those
22   proceedings.  The Court has identified a narrow issue
23   that potentially is dispositive of this case, and it is
24   this.  Does the Consolidated Appropriations Act of 2023
25   bar the final Wedge Closer Rule, indeed the 2023
```

1    emergency Wedge Closure Rule?

2        The Court believes that that issue can potentially

3    be resolved on matters as to which it can take judicial

4    notice, and so I take judicial notice, naturally the

5    federal statute which binds us all, and I take judicial

6    notice of the regulations of the National Marine

7    Fisheries, um, Service to include the 2022 emergency

8    Wedge Closer Rule, the 2023 emergency Wedge Closer Rule,

9    and the Final Wedge Closer Rule.  Also I take judicial

10   notice of proceedings, related proceedings involving

11   these rules in the United States District Court for the

12   District of Columbia.

13       If we go any further than that, and the Clerk

14   tells me that the plaintiffs have brought witnesses --

15   there's no witnesses this afternoon, I have no more than

16   an hour available to you this afternoon, and I wanted to

17   hear from you, um, as rapidly as possible.

18       So confining ourselves to those matters, and

19   nothing else, the issue before the Court is whether the

20   statute is clear on its face and bars the -- the statute

21   and the legislative history is clear on its face and

22   bars the, um, action of the agency here?  If it does

23   not, these proceedings must continue and, um, to

24   consider what weight to give to the interpretation and

25   application given by the agency and the issues that so

1    arise.

2         Since this issue is first up and since the

3    Lobstermen bear the burden of proof, I follow the

4    procedure that the -- and they want the relief here,

5    we'll let the agency, the service argue first, no more

6    than a half an hour, and I don't think it will take a

7    half an hour, and then we'll hear from the Lobstermen.

8    We'll hear the government.

9         MS. MAYHALL:  Thank you, your Honor.

10        I just want to clarify upfront and I would direct

11   the Court's attention to Docket 53, it's the motion for

12   partial summary judgment that we filed this past

13   Tuesday, the Office filed that as a supplemental brief

14   in opposition to plaintiff's emergency injunction motion

15   --

16        THE COURT:  I've read them both.

17        MS. MAYHALL:  Okay.  So I just want to point out

18   in that motion where we have reiterated our opinion that

19   the rule, the trial on the merits, Rule 55(a)(2), is not

20   applicable to APA-based claims, however we view this as

21   a motion for summary judgment proceeding as to the

22   statutory violation claims today, and that would proceed

23   under APA's scope of review, which is deferential to the

24   agency and only sets aside the agency action if

25   arbitrary, capricious, or contrary to law, as your Honor

1    knows.

2         I also would claim --

3         THE COURT:  What's the difference in the sense --

4    as I've framed the issue, what's the difference?  If the

5    statute is clear and the statute -- and I'm not

6    suggesting it does and you've argued against that, but

7    the statute bars the action that the service has taken,

8    that's an end of it, isn't it?

9         MS. MAYHALL:  We would agree that you could review

10   that as just a contrary-to-law review under the APA, we

11   just want to establish for the record our position that

12   there -- as you've just said, there should be no

13   witnesses today, this is not a factfinding mission for

14   the --

15        THE COURT:  Well again, you're entitled to make

16   your record.  I do not agree that the Federal Rules of

17   Civil Procedure, which apply generally to all civil

18   actions, somehow do not apply to an action brought under

19   the Administrative Procedure Act at least in this

20   respect to this, um -- to this extent.

21        All right, go ahead.

22        MS. MAYHALL:  Okay.  I will also point out to your

23   Honor that the remedy plaintiffs are seeking does

24   require that -- originally a preliminary injunction, now

25   a permanent injunction, and it does require that they

```
1    will meet four elements, if your Honor were to rule on

2    that today, and that would be irreparable --

3         THE COURT:  Again, here's my problem.  If this

4    final rule is contrary to an Act of Congress, I don't

5    have to evaluate the public interests, Congress has done

6    that.  If it is contrary to an Act of Congress, I don't

7    have to ask whether they have shown irreparable harm.

8         You disagree with that?

9         MS. MAYHALL:  We would argue, your Honor, under

10   the Supreme Court's holding in Weinberger vs. Romero-

11   Bastero, from 1982, that an injunction is a matter of

12   equitable discretion and that it does not follow some

13   success on the merits as a matter of course.

14        THE COURT:  I see.  I hear you.

15        MS. MAYHALL:  Okay.

16        Other than that, your Honor, I will move to the

17   merits of the claim that you just said you would like to

18   hear today, which I believe is Claim 1 in their

19   complaint, specifically as to the Consolidated

20   Appropriations Act.

21        THE COURT:  And let me press you on this.  If

22   they're right, this case is over, isn't it, as a

23   practical matter?  If I enter an injunction, you have

24   every right to appeal, but -- if I do that.

25        MS. MAYHALL:  If you were to enter an injunction,
```

1    then they would have received the remedy they seek.

2         THE COURT:  And that's it.  Thank you.  Go right

3    ahead.

4         MS. MAYHALL:  So as to the merits of Claim 1.  The

5    Congressional intent in the Consolidated Appropriations

6    Act Right Whale-related provisions is clear and the

7    final Wedge Rule at issue in this case upholds and

8    honors that Congressional intent, it is consistent with

9    that Congressional intent for five reasons.

10        First, the plain language accepts the emergency

11   rule in place at the time of the CAA's enactment as to

12   Section 101(b).

13        THE COURT:  But you agree that the emergency rule

14   was not in effect on that day?

15        MS. MAYHALL:  Correct, the effective date ends on

16   April 30th.

17        THE COURT:  Right.

18        MS. MAYHALL:  But we believe that it was still in

19   place and that's significant.

20        THE COURT:  Where -- in what case that binds the

21   Court, or where do you draw this distinction between

22   what's in effect and what's in place?

23        MS. MAYHALL:  We believe that -- well this gets to

24   the other elements, your Honor.  We believe that because

25   the agency still retained authority to extend that rule

1    under the MMPA, the Marine Mammal Protection Act, the

2    emergency rulemaking authority for up to 90 days in a

3    consecutive emergency season, that rule was still in

4    place at the time of the CAA's enactment even if the

5    dates were not in effect.  So that's the first point,

6    that the plain language specifically --

7        THE COURT:  But that's it, you don't have a

8    decision of the Supreme Court, or some other court, that

9    treats them differently in this wise?

10        MS. MAYHALL:  Not those specific terms.  But a

11    term "in place," from all the searches that we've been

12    doing, is either used colloquially by courts, that's how

13    the cases cited by plaintiffs use it, they're not

14    interpreting how Congress has used the term "in place."

15    It's also used for mineral rights cases, it's a very

16    specific term.  But we have not found a case that has

17    specifically differentiated how Congress sees this "in

18    place" versus "in effect."

19        THE COURT:  I appreciate your candor.  Go ahead.

20        MS. MAYHALL:  Although I will point out to the

21    Court that in Holly Frontier Cheyenne Refining vs.

22    Renewable Fuel Association, that's a Supreme Court case

23    from 2021, in that case the Court found that the term

24    "extend" in a statute need not entail unbroken

25    continuity, and that does get to the point here that in

1    the Marine Mammal Protection Act the authority to extend

2    the rule did not need to be continuous.

3            THE COURT:  But by the time you people try to

4    extend, the Act was in place and the Act would prevent

5    this "additional," if you will, um, burden on the

6    Lobstermen.  So do you -- I'm having some concern about

7    whether Holly Frontier controls here?

8            MS. MAYHALL:  Well we're using that case just to

9    show that the term "extend" could mean -- it does not

10   have to necessarily mean that if the agency had to

11   extend that rule continuously, it made sense to use it

12   here in the consecutive hot-spot season, it would not

13   have made sense for the agency to extend the rule into

14   the summer when that hot-spot, that the migrating whales

15   in this Wedge area and the aggregation appears occurring

16   only February to April of each year, and the agency did

17   extend it the following consecutive hot-spot year.  But

18   I will discuss the other points, your Honor.  So we

19   believe the first point, the plain language, sets "in

20   place," not "in effect," and that's significant.

21           But second, Congress could only have been

22   referring to the 2022 emergency rule because that was

23   the only rule, emergency rule affecting the Lobstermen

24   in decades.

25           THE COURT:  But the statute doesn't say anything

1    about that?

2        MS. MAYHALL:  No, you're right, and I don't know

3    why Congress did not specifically say the 2022 emergency

4    rule, but it did say "in place."  And we can also look

5    at the plaintiff's interpretation, and this our third

6    reason, to see if plaintiff's interpretation gets us any

7    further here.  But the way they've interpreted the

8    statute is to render the entire Section 101(b)

9    superfluous.

10        They theorize that Congress must have been

11    referring to some new emergency rule that the agency

12    could have come up with between the time that Congress

13    enacted the CAA, or passed the CAA, and the President

14    signed it.  That could have only been a matter of 12

15    days, and in this case it was only a matter of 5 1/2

16    days, and there's just no way that the agency would have

17    been to get out a new emergency rule during that time,

18    and in fact it did not.

19        And for comparison, that 2022 emergency rule, from

20    the time it knew it needed to do an emergency rule in

21    January, when the Commonwealth alerted and it asked for

22    a rule, it was not that -- the emergency rule did not

23    get promulgated until March, it took over a month for

24    that rule to get out and the agency worked as quickly as

25    it could.  And so here it's illogical to follow

1     plaintiff's interpretation which refers to a subset of a

2     rule that doesn't exist and could not have existed.

3          And finally, on the basis of the fundamental

4     cannons of statutory interpretation, which is to make

5     sure that all of Congress's provisions and words are

6     given full effect and they're not rendered null or

7     superfluous.

8          Our fourth reason, your Honor, is that the, um,

9     NMFS's interpretation makes them in the context of all

10    of the CAA Right Whale provisions.  And if you look at

11    all of the CAA Right Whale provisions in Section 101(a)

12    1 through 3, Congress has directed NMFS to develop

13    new-year technologies that would help -- that would be

14    good for the Right Whale.  It has directed NMFS to

15    submit an annual report to Congress on the status and

16    the actions being taken to reach the sustainable

17    population of the Right Whale each year until 2028.

18         THE COURT:  But here the clear Congressional

19    intent is not at all inconsistent with that, it is -- it

20    appears that the words directly say, "But now let's have

21    a pause to December 31st, 2028."  That's what the

22    Congress has enacted.

23         MS. MAYHALL:  You're right, your Honor, they have

24    set a pause for new fishery-wide regulations, however --

25    and this gets to our fifth point actually, which is that

1  the legislative history -- and there's not much, but the

2  one, the floor statement we have got from Senator King

3  from Maine, it supports our reading, because he

4  specifically says that this is, um, we're putting a

5  pause on fishery regulations, but we're keeping in place

6  the existing measures, and the existing measure here was

7  the 2022 emergency rule as well as the 2021 rule.

8      THE COURT:  But respectfully I'm having trouble

9  thinking it was existing.  It wasn't in effect, you've

10  got the DC case dismissed saying it was moot, there was

11  no issue, no controversy under Article III.

12      MS. MAYHALL:  Well that's a different argument,

13  your Honor.  So the mootness argument was to the

14  effective dates and as a challenge to that specific

15  rule, but here this is a new challenge to a rule going

16  forward, um, each year and it hinging on --

17      THE COURT:  But going -- that's how I'm -- that's

18  the snarl I find myself in.  But going forward after

19  Congress has passed a statute which says "Pause."

20      MS. MAYHALL:  Well that's what Section 101(a)

21  says, but Section 101(b) specifically excepts an

22  existing emergency rule in place at the time of the

23  enactment --

24      THE COURT:  I do follow it, you're back to your

25  "in place" albeit "not in effect" argument.

 1      MS. MAYHALL:  Right, and what else could Congress

 2  --

 3      THE COURT:  May I ask one other question?  Assume

 4  you're right and if I -- I don't resolve things today,

 5  and I'm not suggesting I would, um, but they do claim

 6  that the final rule, if you look at the coordinates and

 7  the like, is an actual extension on the ground.  You

 8  agree -- and I take no position factually because this

 9  is not something I can take judicial notice of or at

10  least I have not taken judicial notice of it for this

11  hearing, if it is in fact on the ground an extension,

12  you can't do that, isn't that right?

13      MS. MAYHALL:  That's right, but we would disagree

14  it is not a --

15      THE COURT:  But so that's a factual issue.

16  Understood.  All right, thank you very much.  We'll hear

17  the government.

18      MR. CRAGG:  Good afternoon, your Honor.

19      THE COURT:  I didn't mean to cut you off, if you

20  had another argument.

21      MS. MAYHALL:  Well I just wanted to finish -- I'm

22  sorry, I wanted to finish my point as to the legislative

23  history, your Honor.

24      THE COURT:  Please.

25      MS. MAYHALL:  Just one final point, which is that

1    that floor statement we have, Senator King makes it
2    clear that he and his main Congressional delegates
3    created the provision -- and just if we're thinking
4    logically, it doesn't make sense for the Maine
5    delegation to preempt its co-fishery manager in
6    Massachusetts's very publicly-stated desire to protect
7    that hot-spot in the Wedge area that only affects
8    Massachusetts fishermen, and this is where I would
9    direct your Honor to look at the amicus brief that the
10   Commonwealth submitted in this case where it clearly
11   expressed that this has been an interest all along, a
12   publicly-expressed interest, that Massachusetts wanted
13   this protection here in the Wedge area.  And so again,
14   looking at that legislative history, and thinking again
15   why would Maine possibly try to, you know, preempt it's
16   co-fishery manager in Massachusetts?
17           And so taking all of these reasons together, your
18   Honor, we believe it's clear that Section 101(b)
19   specifically accepts action on the Wedge specifically
20   and the agency making final that protection, which it
21   did here.  Thank you.
22           THE COURT:  Thank you very much.
23           MR. CRAGG:  Good afternoon, your Honor.  This is
24   an important case obviously for my clients, but I think
25   there's also a very important fundamental democratic

1  principle here, um, in that my clients, they lost a case

2  in front of Chief Judge Boasberg that represented what's

3  been called an "economic death sentence" for the lobster

4  industry and they did what good Americans should do,

5  they went to the Congress with the fellow Lobstermen

6  from Maine and they petitioned for a law --

7      THE COURT:  Well let's -- I'm not denying anything

8  you say, nor am I approving it.  I have constrained

9  myself to what I -- those matters of which I can take

10  judicial notice and I've tried to list them.  Now

11  legislative history is one, um, and the regulations

12  throughout the relevant period is another.  Obviously

13  it's not a question of taking judicial notice, we're all

14  bound by the statute, and then I take judicial notice of

15  the proceedings before the Chief Judge in the DC

16  District Court.

17      So that has a nice ring to it, and I'm not

18  denigrating your argument, but this is really a confined

19  approach.  I'm sort of setting myself up.  If you were

20  to win today, that's a win, but it's on the narrowest of

21  bases.  I would have to say this statute is clear, this

22  regulation violates this statute and of course is void.

23  Now "downstream," if I may be permitted the phrase, much

24  more evidence may have to be received.  But let's

25  confine ourselves, the way I've confined it, that I

1    thought I might work my way through in this hour.

2        Go ahead.

3        MR. CRAGG:  I was coming to the point.  I totally

4    understand the Court's confining the matter today, I

5    think it's going to be a very efficient way to resolve

6    this, because we do think we're correct on the

7    interpretation of the CAA.

8        What it says is that "The 2021 Atlantic Large

9    Whale Take Reduction Plan amendment shall be deemed

10   sufficient to ensure that the continued federal and

11   state authorizations of the American Lobster and Jonah

12   Crab Fisheries are in full compliance with the

13   Endangered Species Act and the Marine Mammal Protection

14   Act until December 31st, 2028."  As Senator Angus King

15   said, "We're causing the economic death sentence.  It

16   essentially stopped regulation, it's stopped the effect

17   of Chief Judge Boasberg's ruling, and it had an

18   exceedingly --

19       THE COURT:  Well but his ruling was to deny

20   preliminary relief, right?

21       MR. CRAGG:  Oh, I'm going back to the 2022 and not

22   the Wedge Closure in 2023, your Honor.

23       THE COURT:  Oh, okay.  You go right ahead.

24       MR. CRAGG:  Okay.  So that was the APA case

25   brought by the environmental groups that threatened the

1    regulatory regime and that's really what was in

2    response.  Our 2023 Wedge challenge came after the CAA.

3    So that's what I'm speaking of, your Honor.

4        But back to the CAA.  As the Court has identified

5    here, this really all turns on the exception to that

6    pause and what Congress intended with that.  And of

7    course when we interpret statutes we start with the

8    text.  It says that the pause essentially "shall not

9    apply to an existing emergency rule," it doesn't say

10   "emergency," it says "emergency rule," "or any action

11   taken to extend or make final an emergency rule that is

12   in place on the date of the enactment of this Act."

13       So everyone agrees there was no emergency rule in

14   effect.  The government is essentially asking the Court

15   to find a new term of art, um, unrecognized in the case

16   law that there is some type of intermediate type of law

17   that is "in place" but not "in effect."  This is

18   exceedingly novel, and they're asking a lot of work for

19   something that just doesn't have any judicial gloss or

20   even something in "Black's Law Dictionary" to support

21   it.

22       THE COURT:  Well you're now arguing that the -- as

23   I have just asked you to, on the language of the

24   statute, but she gives me pause when she says, um, in

25   the real world the problem here is the migrating habits

1    of Right Whales, I cannot and have not taken judicial

2    notice of that, and so just logically this regulation

3    comes up seasonally to protect the Right Whales in the

4    appropriate season.

5          How do you deal with that?

6          MR. CRAGG:  Well let's go back to where the source

7    of even the emergency rule comes from, the Marine Mammal

8    Protection Act.  The Holly case was brought about the

9    issue of consecutive versus contiguous -- you know

10   successive, things like that.  Holly says you have to

11   look to contextual clues.  And the MMPA section on

12   emergency rules, it's 1387(g), um, has a clear -- shows

13   a clear intent of Congress that emergency rules are

14   supposed to be very short in duration.  What it says

15   essentially is that it could remain in effect for no

16   more than 180 days, or till the end of the applicable

17   commercial fishing season, and then it permits an

18   extension by the secretary of not more than 90 days or

19   until reasons for the emergency no longer exists.  Those

20   are two statutory provisions.  And the statute that

21   originally gave them that rulemaking power, that says

22   "No, we're talking about short durations."  And even if

23   you do that 90-day extension, you're only out for 270

24   days.

25          If we go back to the 2022 emergency rule, going

1    into effect on March 1st, 2022, and we add 270 days to

2    that, that gets us to November 26th, 2022.  Of course

3    the CAA is passed on December 22nd and it goes into

4    effect on December 29th.  So with that additional

5    context, we have additional Congressional intent on the

6    meaning of the emergency rules and how they're supposed

7    to work, they're supposed to be short.  They're not

8    supposed to lay dormant merely because they only used

9    some of the 180 days, because they used 30 days in 2022.

10       And I guess their position is it could be 10 years

11   later and still in place because we didn't use the full

12   180 days, boom, now we can do it.  But that just doesn't

13   make any sense, that's not how things work, and frankly

14   it's contrary to a position they took in another case

15   where NMFS itself said, in Starbound vs. Gutierrez,

16   which we cite, a Western District of Washington case,

17   um, that when an emergency rule expires, it no longer

18   exists essentially, it's no longer the law, it's not

19   still "in place," if you will.

20       THE COURT:  What does this exception mean then?

21   She is certainly correct that I cannot read words out of

22   this statute.

23       MR. CRAGG:  Okay, I'm glad you brought that up,

24   your Honor, because the argument is essentially that

25   this section is now surplusage.  That is not exactly how

1    the cannon against surplusage works.  Surplusage is

2    about is the language effective?  The language of the

3    exception is effective.  What it lacks or wants for is

4    an application.

5         Their argument is akin to saying if the

6    legislature passes a law that says "Don't do X, Y, and

7    Z," and nobody does it, there's no violation, well then

8    the law is surplusage.  That's not true.  The language

9    is effective, that it would ban X, Y, and Z if

10   everybody, you know, is not violating the law.  Sure

11   there's no application, but it still is the law.  The

12   exception language is effective.  But it doesn't have an

13   application because nobody put an emergency rule in

14   place before the date it was effective.

15        You know another way you could maybe characterize

16   their argument is that this is just simply a drafting

17   failure.  If it's a drafting failure, the Court doesn't

18   get to rewrite it, and we certainly don't have any

19   legislative intent -- if your Honor is the kind of judge

20   who likes to look at legislative intent, we don't have

21   any legislative intent that explains the exception.  And

22   to the extent they're relying on Senator King, that's

23   not what he's talking about.  When he's talking about

24   "keeping in place existing measures," he's talking about

25   the 2021, um, Take Reduction Plan, and there are a lot

1    of things in there, you know things like using weak rope

2    to protect the whales and reduce entanglements and

3    things like that.  He's not -- the Senator from Maine is

4    not talking about a closure in the Massachusetts

5    restricted area, and there's no evidence in the record

6    that he was even aware of it.  What he was aware of is

7    the existing measures and the existing regulatory regime

8    that he was keeping in place until 2028.

9         And so with that, your Honor, I would like to

10   turn, um, because your Honor raised at the last hearing

11   to Chevron deference.

12        THE COURT:  I don't -- the way I parsed it,

13   Chevron deference plays no role here for the simple --

14   I'm starting here, you have a possibility of winning on

15   this narrow ground.  If you do not win on this narrow

16   ground, I'm scheduling some further hearing.  You

17   haven't lost the case save that I am not satisfied that

18   the statute, by its terms, voids the challenged

19   regulation.  So I'm going to cut you off on that.

20        Have I heard your argument with respect to the

21   statute?

22        MR. CRAGG:  You have, your Honor, and I know you

23   don't want to hear about irreparable harm.

24        THE COURT:  I do not.

25        MR. CRAGG:  Okay.  The only -- the last issue I

1    would like to just raise with the Court is they have now

2    raised a question about my client's standing and the

3    sufficiency of the declarations we supported to show

4    standing.  Even critiquing Mr. Meschino's declaration,

5    saying it doesn't actually say he planned to fish in the

6    Wedge.  I just -- if the Court's going to issue an

7    injunction, um, I think I need something in the record

8    to show standing before it goes up to the First Circuit.

9         THE COURT:  And what do you propose?  Are you

10   worried about your standing?

11        MR. CRAGG:  Well we're at trial, and so whether I

12   have declarations that I suppose could be stipulated

13   into the record, but I also have Mr. Meschino here, who

14   could testify for 5 to 10 minutes just to establish

15   standing.

16        THE COURT:  No.  So we're clear, I think that, um,

17   based upon the record before the Court, this association

18   has standing to challenge.  Naturally I can be reviewed

19   on that as on anything else.

20        So in essence I've heard your argument, is that

21   right?

22        MR. CRAGG:  You have heard our argument, your

23   Honor.

24        THE COURT:  All right.  Thank you.

25        MS. MAYHALL:  Your Honor, may I make two points

 1 | quickly?

 2 | THE COURT:  Very briefly.

 3 | MS. MAYHALL:  Okay, very quickly I will say that

 4 | Holly Frontier, which they just cited again, does say to

 5 | look at the context of the statute and --

 6 | THE COURT:  I've looked at it.

 7 | MS. MAYHALL:  Okay, just it says to look for the

 8 | words "continuous" and "successive," and MMTA does not

 9 | use those words.

10 | THE COURT:  Yes.

11 | MS. MAYHALL:  And finally, plaintiffs did just say

12 | that Section 101(b) lacks an application, and it will

13 | never have one, and that exactly renders it surplusage.

14 | And that's all I'll say on that, thank you, your Honor.

15 | THE COURT:  I understand your argument.

16 | It's appropriate to say that the Court is -- wants

17 | to express its thanks to the amici here.  The Court is

18 | today proceeding on narrow grounds, but that does not in

19 | any way, um, mean that the amici briefs have not been

20 | helpful and informative to the Court, and I express my

21 | appreciation for them.

22 | After careful review in the days since first we

23 | met, this Court is convinced that the Consolidated

24 | Appropriations Act of 2023 is clear on its face and it

25 | clearly applies to bar the Final Wedge Closer Rule,

which rule this Court today declares void and of no force and effect.

Under the Rules of Civil Procedure, the parties are entitled to a written decision -- well a written or a more extensive declaration, and I propose to write a full written decision supporting the declaration the Court has just made. For today's purposes, it suffices to say, as I have said in conclusory terms, that, um, here this business about a statute -- I do not accept this idea that in effect is -- has some markedly different, um, intent, as I parse the words, from the phrase "in place," in context and in light of the legislative history, Congress, um, in the plain and ordinary meaning of the words, intended a pause. I don't have a pause here. And so the Court declares that, um, this final emergency Wedge provision is in conflict with the governing statute and therefore is void and has no effect at least through December 31, 2028.

I speak from the bench now promptly before I have provided a full written opinion, because equitable relief is being sought, and yet I'm not going to enter a formal injunction, and here's why.

I was brought up in the courts of the Commonwealth of Massachusetts which have a gentler and more

1   respectful, um, interaction between the branches than I

2   find is the case at the federal level.  I was taught

3   that once a court clearly declares the law, the

4   responsible agencies of the executive branch are

5   presumed to follow the law as it is declared.  Here I

6   have so declared.  A written opinion will follow so

7   declaring, the Clerk will enter a final judgment with

8   this declaration promptly, and that judgment is

9   appealable.  The parties expect an appeal, the Court

10  welcomes an appeal.  My written opinion will promptly

11  catch up with it, but not this afternoon.

12       I'm not going to -- I'm not going to interrogate

13  government counsel, because I think I've made myself

14  clear, and I will, before I recess, ask if there are any

15  questions.  And I have every reason to believe the

16  National Marine Fisheries will obey the declaration of

17  the law, as this Court has declared it, and its rights

18  to appeal promptly kick in as soon as the judgment

19  enters, which will be forthwith.

20       And I should ask if there's any questions.  Any

21  questions?

22       MS. MAYHALL:  Yes, two brief questions, your

23  Honor.

24       First of all, um, you said that you're not

25  entering a formal injunction, but are you going to be

1    making a finding as to the other injunctive elements,

2    the irreparable harm balanced upon --

3         THE COURT:  I don't think -- well I'll make the

4    judgment that I think I need make from the bench.

5    Subject to some additional reflection, where I think the

6    regulation clearly flouts the law, I don't think I have

7    to.

8         MS. MAYHALL:  And second, your Honor, um, because

9    of the seriousness and potential elements of harm to the

10   Right Whales, while the United States does make a

11   decision as to whether to appeal, we would request a

12   stay of an order granting that this rule is void or

13   vacated.

14        THE COURT:  The motion for stay is denied, and of

15   course you know very well that you may seek a stay from

16   the Court of Appeals.

17        All right, no other questions?  (Silence.) Hearing

18   none, that's the order of the Court.  The declaration

19   terminates the case because everyone is clear that now

20   the lobsters have the relief that they seek.  I will

21   continue to exercise my jurisdiction under the rules

22   should the agency act contrary to the declaration.  But

23   in all candor, I want to give them as much flexibility

24   as possible and preserve their rights to challenge the

25   declaration and ruling of the Court made today.

1            I do thank you all.  It's been very helpful.

2    We'll recess.

3            (Ends, 2:20 p.m.)

```
 1                    C E R T I F I C A T E

 2

 3

 4           I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5      do hereby certify that the foregoing record is a true

 6      and accurate transcription of my stenographic notes

 7      before Judge William G. Young, on Thursday, March 14,

 8      2024, to the best of my skill and ability.

 9

10

11

12      /s/ Richard H. Romanow 03-20-24
        _____
13      RICHARD H. ROMANOW    Date

14

15

16

17

18

19

20

21

22

23

24

25
```